UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL TORRES and<br>CHRISTOPHER MEDINA<br><br>                  Plaintiffs,<br><br>   – against –<br><br>CITY OF NEW YORK; RAYMOND W. KELLY,<br>Former Commissioner of the New York City Police<br>Department ("NYPD"), in his individual and official<br>capacities; WILLIAM BRATTON, Commissioner of<br>the NYPD, in his individual and official capacities;<br>NYPD Deputy Inspector JOHN HART, in his<br>individual and official capacities; NYPD Deputy<br>Inspector CHRISTOPHER J. MCCORMACK, in his<br>individual and official capacities; NYPD Inspector<br>JOSEPH DOWLING, in his individual and official<br>capacities; NYPD Inspector NILDA HOFMANN, in<br>her individual and official capacities; NYPD Detective<br>GEORGE GOULART, Shield # 5792, in his<br>individual and official capacities; NYPD Officer<br>NICHOLAS LEVESQUE, Shield # 15044, in his<br>individual and official capacities; RICHARD ROES<br>## 1-10; and JOHN DOES ## 1-11,<br><br>                  Defendants. | 14 Civ. 6525 (JPO)<br><br>**AMENDED COMPLAINT<br>AND JURY DEMAND**<br><br>**ECF CASE** |

        Plaintiffs Michael Torres and Christopher Medina (hereinafter "Plaintiff" or

collectively, "Plaintiffs"), by their attorneys The Bronx Defenders and Fisher, Byrialsen &

Kreizer, PLLC, for their Complaint allege as follows:

## PRELIMINARY STATEMENT

        1.      This is a civil rights action against the City of New York (the "City") and

New York City Police Department ("NYPD") officers (collectively "Defendants") for

deliberately targeting Plaintiffs—two Latino men—stopping and searching them without cause,

lying about their conduct, and falsely charging them with a crime they did not commit, namely, possessing marijuana in a manner that is "open to public view."  As a result of Defendants' unlawful actions, Plaintiffs, and indeed thousands of individuals in New York City, and the Bronx in particular, have been unnecessarily forced to endure the humiliation, burden, damage and negative collateral consequences of being falsely charged with a misdemeanor crime, put through the criminal justice system, and compelled to return to court multiple times—all for a crime they did not commit and which the charging police officers *knew* they did not commit. Plaintiffs seek to recover damages for Defendants' improper stops, illegal searches, false arrests, malicious prosecutions and abuses of process in violation of the Fourth and Fourteenth Amendments to the United States Constitution and state common law.

> 2.     Plaintiffs are both residents of the Bronx, where they work in construction and maintenance jobs, and where they live with their families.  Plaintiffs were both arrested and charged with violating N.Y. Penal Law § 221.10 (hereinafter, "§ 221.10"), a class B misdemeanor, which prohibits possessing a small quantity of marijuana (less than twenty-five grams) that is either "burning or open to public view."  At the time they were arrested, neither of the Plaintiffs possessed marijuana that was burning or open to public view.  Instead, each Plaintiff was unlawfully stopped and searched.  As a result of these illegal intrusions, each Plaintiff was found to have a small quantity of marijuana concealed on his person.  New York's Penal Law mandates that persons found in possession of a small quantity of concealed marijuana may only be charged under N.Y. Penal Law § 221.05 (hereinafter, "§ 221.05"), a violation as opposed to a misdemeanor.  In each Plaintiff's case, the charging police officer lied about the Plaintiff's conduct by asserting he had possessed marijuana in "public view," and charged the

Plaintiff with a misdemeanor crime rather than a violation (hereinafter the "Manufactured Misdemeanor").

3.       For each Plaintiff, the practical consequences of the Manufactured Misdemeanor are enormous—the misdemeanor charge is entered into the New York State Division of Criminal Justice Services ("DCJS") database, which may follow a person for life; a person is deprived of his statutory entitlement to the issuance of a Desk Appearance Ticket ("DAT"), *see* N.Y. Crim. Proc. Law § 150.75, unnecessarily subjecting him to full arrest process and hours—sometimes days—of pre-arraignment incarceration; and the speedy trial time allotted to the prosecution is extended, increasing the number of court dates and missed days of work a person must endure in order to exercise his right to challenge the evidence against him. *Compare* N.Y. Crim. Proc. Law § 30.30(c) (sixty days where defendant is charged with a misdemeanor) *with* N.Y. Crim. Proc. Law § 30.30(d) (thirty days where defendant is charged with a violation).  And, unlike a violation, a person convicted of a class B misdemeanor may be sentenced to up to three months in jail.

4.       Plaintiffs are not the only New Yorkers of color who have been subject to Manufactured Misdemeanors by the NYPD for possessing small quantities of marijuana concealed on their person.  Studies consistently show that Black and Latino New York City residents, such as Plaintiffs, are overwhelmingly and disproportionately targeted for NYPD's marijuana arrest practices.  From 2003 through 2011, 87.0% of people arrested and charged under § 221.10 for possessing marijuana "burning or open to public view" in New York City were either Black or Latino.  Conversely, only 10.2% were White.  The practice is even more acute in the Bronx, where the DCJS reports that 95.4% of all persons arrested and charged under § 221.10 were either Black or Latino.

5.      Defendants' misconduct is part of a pervasive and entrenched pattern of misconduct by the NYPD relating to the enforcement of marijuana laws.  Through drug reform lobbying efforts in Albany, reports by civil rights organizations, countless news articles, and other means, the NYPD has long been aware that its officers regularly Manufacture Misdemeanors against Blacks and Latinos.  Indeed, the NYPD itself has acknowledged how systemic the practice of Manufacturing Misdemeanors is on the force.  *See* NYPD Operation Order # 49, September 19, 2011.  Nonetheless, the NYPD has deliberately chosen to ignore the known misconduct of its officers and failed to provide adequate training or supervision to halt the constitutional violations that Manufactured Misdemeanors so obviously cause to Black and Latino New Yorkers.  In fact, the NYPD has encouraged Manufactured Misdemeanors by promoting a policy and practice of targeting communities of color for heightened enforcement of the marijuana laws, subjecting Blacks and Latinos to the harsher consequences of a misdemeanor prosecution and sentence at a significantly higher rate than other New York City residents.

6.      The NYPD's policy, practice and custom of Manufacturing Misdemeanors against people of color is driven, at least in part, by the intense pressure placed on officers to generate more arrests, more summonses, and more "activity" of all kinds.  Upon information and belief, officers who fail to achieve a specific amount of "activity" for each category of offense— felony, misdemeanor and violation—are penalized.  *See Floyd v. City of New York*, 959 F. Supp. 2d 540, 602 (S.D.N.Y. 2013) ("officers are routinely subjected to significant pressure to increase their stop numbers, without corresponding pressure to ensure that stops are constitutionally justified").

7.      Plaintiffs, like other Blacks and Latinos throughout New York City, and particularly the Bronx, were falsely charged and prosecuted for a crime they did not commit and

improperly subjected to the harsh consequences of being charged with a misdemeanor crime based on the officers' fabrications.  Plaintiffs are entitled to damages for Defendants' unlawful actions.

## PARTIES

8.     Plaintiffs are all citizens of the United States.  At all relevant times, they resided in Bronx, New York.

9.     Defendant City is a municipal corporation organized and existing under the laws of the State of New York.  At all times relevant hereto, defendant City, acting through the NYPD, was responsible for the policy, practice, supervision, implementation and conduct of all NYPD matters and was responsible for the appointment, training, supervision and conduct of all NYPD personnel, including the defendants referenced herein.  In addition, at all relevant times, defendant City was responsible for enforcing the rules of the NYPD, and for ensuring that NYPD personnel obey the laws of the United States and the State of New York.

10.     Defendant Raymond W. Kelly was the Police Commissioner of the City of New York from January 2002 through December 2013 and, as such, made and enforced the policy of the NYPD, and acted in his capacity as agent, servant, and employee of defendant City, within the scope of his employment as such, and under color of state law.

11.     Defendant William Bratton became the Police Commissioner of the City of New York in January 2014 and continues to serve in that position and, as such, made and enforced the policy of the NYPD, and acted in his capacity as agent, servant, and employee of defendant City, within the scope of his employment as such, and under color of state law.

12.     Defendant John Hart was the Commanding Officer of the NYPD's 46th Precinct and, upon information and belief, was the Commanding Officer of the NYPD's 46th

5

Precinct at the time of the events alleged herein up to and until May 2014.  In his role as Commanding Officer, defendant Hart made and enforced the policy of the 46th Precinct, and acted in his capacity as agent, servant, and employee of defendant City, within the scope of his employment as such, and under the color of state law.

13.     Defendant Christopher J. McCormack was the Commanding Officer of the NYPD's 46th Precinct and, upon information and belief, was the Commanding Officer of the NYPD's 46th Precinct at the time of the events alleged herein beginning in May 2014.  In his role as Commanding Officer, defendant McCormack made and enforced the policy of the 46th Precinct, and acted in his capacity as agent, servant, and employee of defendant City, within the scope of his employment as such, and under the color of state law.

14.     Defendant Joseph Dowling was the Commanding Officer of the NYPD's 52nd Precinct and, upon information and belief, was the Commanding Officer of the NYPD's 52nd Precinct at the time of the events alleged herein up to and until September 2013.  In his role as Commanding Officer, defendant Dowling made and enforced the policy of the 52nd Precinct, and acted in his capacity as agent, servant, and employee of defendant City, within the scope of his employment as such, and under the color of state law.

15.     Defendant Nilda Hofmann is the Commanding Officer of the NYPD's 52nd Precinct and, upon information and belief, was the Commanding Officer of the NYPD's 52nd Precinct at the time of the events alleged herein beginning in September 2013.  In her role as Commanding Officer, defendant Hofmann made and enforced the policy of the 52nd Precinct, and acted in her capacity as agent, servant, and employee of defendant City, within the scope of her employment as such, and under the color of state law.

16.     At all times relevant hereto, Richard Roes # 1-10, acting in their capacity as agents, servants, and employees of defendant City, and within the scope of their employment as such, were training, supervisory and policy making personnel within the NYPD who implemented, enforced, perpetuated and/or allowed the unconscionable policy of Manufacturing Misdemeanors.  Plaintiffs are unable to determine the names of these supervisory defendants at this time and thus sue them under a fictitious designation.

17.     All NYPD supervisory defendants, including defendants Kelly and Bratton, are referred to collectively herein as the "Supervisory Defendants."

18.     At all times relevant hereto, NYPD Detective George Goulart, Shield # 5792, was a detective in the NYPD, acting in the capacity of agent, servant and employee of defendant City, and within the scope of his employment as such.

19.     At all times relevant hereto, NYPD Officer Nicholas Levesque, Shield # 15044, was a police officer in the NYPD, acting in the capacity of agent, servant and employee of defendant City, and within the scope of his employment as such.

20.     At all times relevant hereto, defendants John Does # 1-11, whose actual names Plaintiffs have been unable to ascertain notwithstanding reasonable efforts to do so, but who are sued herein by the fictitious designation "John Doe" and "Jane Doe," were police officers in the NYPD, acting in the capacity of agents, servants and employees of defendant City, and within the scope of their employment as such.

21.     All NYPD officer defendants, excluding the Supervisory Defendants, are referred to collectively herein as the "Individual Defendants."

## JURISDICTION AND VENUE

22.     This action arises under the Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1983 and 1988, and state common law.

23.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3) and (4), 1367(a), and the doctrine of supplemental jurisdiction.

24.     The acts complained of occurred in the Southern District of New York and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).  In addition, Defendants conduct business and maintain their principal place of business in the Counties of Bronx and New York.

## JURY DEMAND

25.     Plaintiffs demand trial by jury in this action.

## FACTUAL BACKGROUND

*New York Law Regarding Marijuana Possession*

26.     In New York, a person who possesses less than twenty-five (25) grams of marijuana concealed on his person is guilty of violating § 221.05, a non-criminal violation that does not allow for jail time for first-time offenders.  The maximum allowable penalty for a first-time offender convicted of violating § 221.05 is a fine of up to $100.  Where a person is charged with violating § 221.05, and no other offense is alleged, the person must "promptly" be issued a DAT and released from custody.  *See* N.Y. Crim. Proc. Law § 150.75.  A DAT requires a person to appear in court at some later specified date; they are not subject to the full arrest process.

27.     Section 221.10 of the New York Penal Law, on the other hand, is a class B misdemeanor, which allows for sentences of up to three months in jail.  *See* N.Y. Penal Law § 70.15.  Unlike a violation under § 221.05, an individual charged with a misdemeanor under §

221.10 may be lawfully held in police custody for arraignment before a judge.  *See* N.Y. Crim. Proc. Law § 140.20(2).

***Negative Consequences of Being Charged with a Misdemeanor Instead of Violation***

28.    The negative collateral consequences of being charged with a misdemeanor instead of a violation are profound.  A person charged with a misdemeanor may be held in custody until he or she can be seen by a judge for arraignment.  This period of detention regularly lasts at least twenty-four (24) hours, and frequently extends even longer.  Plaintiff Mr. Torres was detained overnight before appearing before a judge for arraignment.

29.    Pre-arraignment conditions are typically deplorable and over-crowded.  Detainees are usually forced to share a single toilet and to sleep sitting up, as cots or beds are not provided.

30.    A person charged with a misdemeanor is fingerprinted and photographed, and the person's information is entered into the DCJS database.  These entries remain in the database regardless of whether the person is convicted of a crime.  Violation arrests, on the other hand, are not entered into the DCJS database.

31.    Being listed in the DCJS database can have a damaging impact on a person's life.  State agencies screen job applicants as a matter of course using the DCJS database when deciding whether to hire or retain an employee or grant an occupational license.

32.    In addition, a person who is charged with a misdemeanor is likely to be subject to court jurisdiction for a significantly longer period of time—and have to appear in court more times—than if he was charged with a violation.  New York's Criminal Procedure Law provides that a person charged with a B misdemeanor must be tried within sixty days of the commencement of the criminal action, while a person charged with a violation must be tried

within thirty days of the commencement of the criminal action.  N.Y. Crim. Proc. Law §
30.30(c), (d).  In practice, these statutory time limits are virtually never met.  Here, Plaintiffs'
cases were both pending for well over two years before dismissal.

33.     The additional thirty days of speedy trial time allocated to prosecutors
when a misdemeanor, rather than a violation, is charged can alter the course of a case.  Plaintiffs
had to wait an average of 117 days from arraignment until their first trial date.  During this
period, no speedy trial time accrued.  Once Plaintiffs' cases were in a trial-ready posture,
prosecutors were responsible for 80% of postponements on trial dates.

34.     In the Bronx, prosecutors regularly request short adjournments—of seven
days, on average—while the average actual length of an adjournment is almost two months.
This pattern is replicated in virtually all marijuana possession cases in the Bronx.  Thus, by
artificially increasing the speedy trial time available to prosecutors by thirty days, the practice of
Manufacturing Misdemeanors may actually extend the life of a case by many months.  For
example, Mr. Torres' case was dismissed 877 days after his arraignment.  Mr. Medina's case was
dismissed 902 days after his arraignment and 1,000 days after his arrest.  The artificial expansion
of statutory speedy trial limitations resulting from the Manufactured Misdemeanors had the
practical effect of extending the life of Mr. Torres' case by at least 497 days and Mr. Medina's
case by 336 days.

*Marijuana Arrests in New York City*

35.     Arrests for possession of small amounts of marijuana have been one of the
primary forces driving the explosion of misdemeanor arrests in New York City over the past
decade.  Indeed, § 221.10 arrests accounted for 1 in 5 misdemeanor arrests and 1 in 7 of *all*
arrests in New York City in 2011.  Arrests for possession of marijuana are reportedly the most
common type of arrest made by the NYPD.  In 2011 alone, DCJS calculated that the NYPD

charged 50,688 people with § 221.10, bringing the total number of arrests under the statute for the five-year period from 2007 through 2011 to 227,118.

36.     Black and Latino New Yorkers in low-income neighborhoods have overwhelmingly been the target of the NYPD's marijuana arrest practices.  Citywide, Blacks and Latinos accounted for 84.1% of all § 221.10 arrests in 2011.  In the Bronx, in 2011, 94.6% of the 13,131 people arrested under § 221.10 were Black or Latino.  This is notwithstanding evidence from a number of studies looking at marijuana usage rates since the turn of the 21st century showing that Blacks, Latinos and whites use marijuana at roughly equal rates.[1]  Black and Latino *arrest* rates for marijuana possession, however, are significantly higher than those for whites, particularly in the Bronx.  In 2010 in the Bronx, the marijuana arrest rate for Blacks was 1,640 per 100,000 residents; for Latinos it was 892 per 100,000 residents; while for whites it was only 324 per 100,000 residents.[2]

### Notice of the Unconstitutional Practice of Manufacturing Misdemeanors

37.     The NYPD has long been aware of how pervasive the practice of Manufacturing Misdemeanors is amongst NYPD officers.  As far back as May 2007, a professor from Queens College testified publicly in front of two committees of the New York State Assembly regarding marijuana arrests in New York City.[3]  As part of his testimony, the professor explained that most people arrested for marijuana possession were not smoking in public, but rather were generally found with marijuana in their pocket.  The professor also

---

[1] *See, e.g.*, U.S. Dep't Health and Human Servs., SAMHSA, Office of Applied Studies, *National Survey on Drug Use and Health, 2002-2009* (2012), *available at* www.icpsr.umich.edu/icpsrweb/SAMHDA/studies/32101; American Civil Liberties Union, *The War on Marijuana in Black and White* 66-67 (2013) (hereinafter "ACLU Report"), *available at* www.aclu.org/criminal -law-reform/war-marijuana-black-and white-report.
[2] ACLU Report at 94.
[3] *See* Testimony of Harry G. Levine at Hearings of New York State Assembly Committees on Codes and on Corrections, Albany, New York, May 31, 2007 *available at* http://www.drugpolicy.org/sites/default/files/nymmj_levinetest.pdf.

highlighted the NYPD's practice of targeting communities of color for heightened enforcement of the marijuana laws.

38.     In April 2008, the New York Civil Liberties Union ("NYCLU") issued a report entitled "Marijuana Arrest Crusade: Racial Bias and Police Policy in New York City 1997-2006."[4]  The report included a section called "Dropsy Arrests: How Pot in a Pocket Becomes Marijuana 'Burning or Open to Public View,'" in which the authors chronicle how and why NYPD officers Manufacture Misdemeanors, and the alarming frequency with which the practice is used.  For example, the authors note the following:

> Approximately two-thirds to three-quarters of those arrested for marijuana possession were not smoking and most were not displaying the marijuana.  Most had marijuana in a pocket or otherwise well concealed in their clothing or possessions.  However, the officers who found the marijuana in a search said in their report, and when speaking to an Assistant District Attorney, that they observed the marijuana because it was "open to public view."[5]

39.     Upon information and belief, high-ranking NYPD officials reviewed the NYCLU's report.  On April 30, 2008, an NYPD spokesman issued a formal response to the NYCLU's report, but failed to specifically address the practice of Manufacturing Misdemeanors that the report detailed.  *See* "Flawed Study on Marijuana Arrests" *available at* http://www.nyc.gov/html/nypd/html/pr/flawed_report.shtml.

40.     The NYPD's response to the NYCLU report did, however, acknowledge a striking disparity between the number of persons charged with § 221.10 and the number of persons charged with § 221.05.  It noted that, from 1997-2006, there were approximately 350,000 people charged with a misdemeanor under § 221.10, while there were only approximately 8,770 people charged with a violation under § 221.05.  *Id.*  Thus, according to the

---

[4] *Available at* http://www.nyclu.org/files/MARIJUANA-ARREST-CRUSADE_Final.pdf.
[5] *Id.* at 39.

NYPD's own numbers, during a ten year period, approximately 98 out of every 100 persons arrested for low-level marijuana possession were found to be in possession of marijuana that was "burning or open to public view."  It defies logic to presume that such an overwhelming majority of persons arrested for marijuana possession would have been found holding marijuana that was burning or in plain view.  The NYPD's own numbers suggest that officers have been Manufacturing Misdemeanors for years; yet the NYPD deliberately chose to ignore the obvious implication of its statistics and permitted its officers to continue violating the constitutional rights of New York City residents.

41.     The NYPD was also on notice of the prevalence of Manufactured Misdemeanors and of the racially-biased enforcement of the marijuana laws through numerous articles in newspapers, magazines, and online news sources that appeared prior to any of the Plaintiffs' arrests. [6]

42.     In 2011, a series of investigative reports by WNYC reporter Ailsa Chang identified numerous people arrested for marijuana possession who, like Plaintiffs, had been charged with possessing marijuana in public view even though the marijuana had only come into public view as a result of a police request or an unlawful search.[7]

---

[6] *See, e.g.*, Christine Hauser, *A Little Stop-and-Frisk May Turn Up a Little Pot*, N.Y. TIMES, Apr. 29, 2008, *available at* http://cityroom.blogs.nytimes.com/2008/04/29/a-little-stop-and-frisk-may-turn-up-a-little-pot/#more-2698; Marc Jacobson, *The Splitting Image of Pot*, N. Y. MAG., Sep. 21, 2009, *available at* http://nymag.com/news/features/58995/; Tony Newman, *Stop the War on Pot Smokers*, N.Y. DAILY NEWS, Aug. 25, 2009, *available at* http://www.nydailynews.com/opinion/stop-war-pot-smokers-article-1.399588; Gabriel Sayegh, *New York City's Massive Marijuana Arrests*, HUFFINGTON POST (Aug. 26, 2009), http://www.huffingtonpost.com/gabriel-sayegh/new-york-citys-massive-ma_b_269384.html; Alice Speri, *2010 Marijuana Arrests Top 1978-96 Total*, N.Y. TIMES, Feb. 11, 2011, *available at* http://cityroom.blogs.nytimes.com/2011/02/11/marijuana-arrests-increase-in-new-york-city/.

[7] *See* Ailsa Chang, *Alleged Illegal Searches by NYPD May Be Increasing Marijuana Arrests*, WNYC, Apr. 26, 2011 *available at* http://www.wnyc.org/story/126232-marijuana-arrests/; Ailsa Chang, *Alleged Illegal Searches by NYPD Rarely Challenged in Marijuana Cases*, WNYC, Apr. 27, 2011 *available at* http://www.wnyc.org/story/126530-alleged-illegal-searches/; Ailsa Chang, *Police Commissioner Calls on NYPD to Stop Improper Marijuana Arrests*, WNYC, Sept. 23, 2011 *available at* http://www.wnyc.org/story/160516-police-commissioner-calls-nypd-stop-improper-marijuana-arrests/; Ailsa Chang, *Marijuana Arrests Dip after NYPD Order, But Allegations of Improper Arrests Continue*, WNYC, Dec. 8, 2011 *available at* http://www.wnyc.org/story/174592-blog-marijana-numbers/.

43.     And on September 19, 2011, defendant Kelly issued a department-wide order—"Operations Order #49"— acknowledging that "[q]uestions have been raised about the processing of certain marihuana arrests."  The Operations Order specifically addressed the practice of Manufacturing Misdemeanors and instructed officers regarding the circumstances under which § 221.10 may be properly charged.  Upon information and belief, defendant Kelly would not have issued such a department-wide order unless he and other high-ranking NYPD officials were aware of the frequency with which NYPD officers were Manufacturing Misdemeanors.  Indeed, at a news conference following the issuance of the Operations Order, defendant Kelly acknowledged that he had been aware of the Manufactured Misdemeanor issue prior to the issuance of the order.[8]

### The NYPD's Deliberate Indifference to Manufactured Misdemeanors

44.     Despite being aware that NYPD officers were regularly Manufacturing Misdemeanors, the NYPD and the Supervisory Defendants deliberately chose to ignore the facially unconstitutional practice and failed to take sufficient steps to stop Manufactured Misdemeanors from continuing to occur.

45.     The NYPD and the Supervisory Defendants' awareness of the prevalence of Manufactured Misdemeanors made it obvious that increased supervision and better training were needed to curb the well-entrenched practice and to protect against constitutional violations. Yet the NYPD and the Supervisory Defendants did nothing to improve the supervision or training they provided to NYPD officers regarding marijuana arrests.  By failing to do so, the NYPD and the Supervisory Defendants displayed a deliberate indifference to constitutional violations that they knew were occurring.

---

[8] *See* Ailsa Chang, *Police Commissioner Says Marijuana Order Came after Allegations of Improper Arrests*, WNYC, Sept. 28, 2011 *available at* http://www.wnyc.org/story/161414-blog-police-commissioner-says-marijuana-order-came-after-allegations-improper-arrests/.

46.     The Operations Order issued by defendant Kelly failed to stop the practice of Manufacturing Misdemeanors.  Upon information and belief, the Order was not accompanied by increased supervision of NYPD officers or improved training regarding New York's marijuana laws.  By permitting the issuance of an order without implementing any enforcement mechanism or any change in departmental supervision or training, the NYPD and the Supervisory Defendants were deliberately indifferent to the effectiveness of the Operations Order in actually curtailing Manufactured Misdemeanors.  Indeed, plaintiff Mr. Torres was arrested and charged with a Manufactured Misdemeanor just days after defendant Kelly issued the Operations Order.

47.     Additionally, in 2013, six plaintiffs, all Black or Latino men from the Bronx who were arrested between March 5, 2011 and March 16, 2012, filed a civil rights suit against the City alleging that it had a pattern and practice of Manufacturing Misdemeanors in marijuana cases.  *See Felix, et al. v. City of New York*, 13-CV-2941 (JMF) (S.D.N.Y).

### NYPD Quotas: Encouraging Manufactured Misdemeanors

48.     The NYPD relies on a *de facto* quota system.  The NYPD enforces its quota system by disciplining those officers who do not meet their quotas.  These consequences incentivize NYPD officers to do everything in their power to make their quotas.

49.     During hearings in *Floyd, et al. v. City of New York, et al.*, 08-CV-1034 (SAS) (S.D.N.Y.), multiple NYPD officers testified that because of mandated quotas for arrests, summonses and stop-and-frisks, officers were compelled to make unlawful stops and arrests.[9] Based on the evidence presented, the Court made extensive findings regarding the pressure

---

[9] *See* Marina Carver, *NYPD Officers Say They Had Stop-and-Frisk Quotas*, CNN, Mar. 22, 2013, *available at* http://www.cnn.com/2013/03/22/justice/new-york-stop-and-frisk-trial.

placed on NYPD police officers to generate "activity."  *See Floyd v. City of New York*, 959 F.

Supp. 2d 540, 591-602 (S.D.N.Y. 2013).  In particular, the Court found that this pressure

extended to making a certain number of arrests per month.  *Id.* at 599.

50.     In 2010, NYPD Officer Adhyl Polanco, then of the 41st Precinct in the

Bronx, revealed that he had made various recordings during roll call meetings at the 41st Precinct

that provided direct evidence of the existence of a quota system for summonses and arrests.  *See*

*Stinson v. City of New York*, 282 F.R.D. 360, 366-67 (S.D.N.Y. 2012) (quoting recordings as

evidence of the existence of a quota system).   In a subsequent television interview, Officer

Polanco told a reporter, "At the end of the night you have to come back with something.  You

have to write somebody, you have to arrest somebody, even if the crime is not committed, the

number's there.  So our choice is to come up with the number."[10]

51.     The pressure Officer Polanco felt to make more arrests and ignore

constitutional limitations was not unique.  In March 2012, John A. Eterno, Ph.D. and Eli B.

Silverman, Ph.D. conducted a survey of close to 2,000 retired NYPD officers and found that

during the tenure of defendant Kelly, NYPD officers simultaneously felt increased pressure to

make more arrests and decreased pressure to obey legal and constitutional restrictions.[11]

52.     One veteran NYPD officer explained to *The Nation*: "If you don't meet

the quota, they will find [activity] for you.  The sergeant will put you in his car and drive you

---

[10] Jim Hoffer, *NYPD Officer Claims Pressure to Make Arrests*, March 2, 2010, *available at*
7online.com/archive/7305356/.
[11] John A. Eterno, Ph.D. and Eli B. Silverman, Ph.D., *Smoking Gun Emerges: Findings of 2012 NYPD Retiree Study*
(June 14, 2012), *available at* www.unveilingnypdcompstat.blogspot.com; *see also Floyd v. City of New York*, 959 F.
Supp. 2d 540, 594-98 (S.D.N.Y. 2013).

around until whatever he sees he will stop and tell you to make an arrest or write a summons, even if you didn't observe what he said it was."[12]

53.     As a result of this *de facto* quota system, and the perverse incentives it imposes, NYPD officers have developed a policy, practice and custom of fabricating criminal complaints—including Plaintiffs'—so as to "justify" charging a misdemeanor rather than a violation.

54.     The NYPD, through the Supervisory Defendants, enforces its quota system and encourages officers to Manufacture Misdemeanors.

## INDIVIDUAL PLAINTIFFS' FACTUAL ALLEGATIONS

*Michael Torres*

55.     Mr. Torres is a 41 year old Latino man who lives in the Bronx.

56.     On September 26, 2011, shortly before 12:30 p.m., Mr. Torres exited the Kingsbridge Road train station at Kingsbridge Rd. and Jerome Ave. in the Bronx and walked east to Webster Ave.  When he reached Webster Ave., he began to walk northbound on Webster Ave. toward 197th St.

57.     Mr. Torres had an interview scheduled that afternoon for a job as a building superintendent for a building located on Webster Ave. between 197th St. and 198th St. He carried a folded sweatshirt over his arm and a folder containing a copy of his resume, cover letters and references as he walked.

58.     As Mr. Torres passed 2735 Webster Ave., an unmarked police vehicle pulled up alongside him.

---

[12] Ross Tuttle, *New York's Police Union Worked with the NYPD to Set Arrest and Summons Quotas*, March 19, 2013, *available at* http://www.thenation.com/article/173397/audio-new-yorks-police-union-worked-nypd-set-arrest-and-summons-quotas.

59.     Mr. Torres was not engaged in any behavior that might have indicated or suggested that criminal activity was afoot.

60.     Defendants Goulart and John Doe #1 exited the police vehicle and approached Mr. Torres on the sidewalk.

61.     Defendant Goulart asked Mr. Torres where he was going.

62.     Mr. Torres began to respond that he was walking to a job interview.

63.     Before waiting for Mr. Torres' response, however, and without provocation or justification, defendant Goulart grabbed Mr. Torres, pushed him against the hood of the police vehicle, forced Mr. Torres to place his hands on the hood of the police vehicle, and kicked his legs apart.

64.     As defendant Goulart pushed Mr. Torres against the car, he grabbed the sweatshirt and folder out of Mr. Torres' hands.  Defendant Goulart briefly inspected the sweatshirt before placing it on the hood of the car along with the folder.

65.     Without a warrant, without justification and without Mr. Torres' consent, defendant Goulart began to search Mr. Torres' person.

66.     While defendant Goulart was searching Mr. Torres, he unbuckled Mr. Torres' belt, placed his hands under the waistband of Mr. Torres' underwear, and began to shake Mr. Torres' pants, almost lifting Mr. Torres off the ground.  Defendant Goulart also searched inside of Mr. Torres' pants pockets and made Mr. Torres remove his shoes.

67.     A number of pedestrians observed defendant Goulart's invasive search of Mr. Torres, causing Mr. Torres to feel humiliated, disrespected and violated.

68.     Following an extensive and unjustified search of Mr. Torres' person, defendant Goulart took the sweatshirt that Mr. Torres had been carrying and began to shake it

vigorously.  As defendant Goulart shook the sweatshirt, a small amount of marijuana fell out of the sweatshirt sleeve.

69.     The marijuana defendant Goulart recovered from Mr. Torres' sweatshirt sleeve was inside Mr. Torres' sweatshirt from the time he exited the train until the time it was recovered by defendant Goulart.  It was never in public view.

70.     During this illegal and unjustified search, defendant Goulart confiscated a number of items from Mr. Torres, including his phone, keys, a pair of headphones and the folder containing Mr. Torres' job application materials.

71.     Mr. Torres was then handcuffed on the sidewalk.

72.     Defendants Goulart and John Doe #1 held Mr. Torres in custody on the sidewalk for approximately twenty minutes before another unmarked police vehicle, a van, arrived on the scene.  Two plainclothes police officers, defendants John Doe #2 and John Doe #3, exited the vehicle and, after speaking briefly to defendants Goulart and John Doe #1, placed Mr. Torres in the van.

73.     When Mr. Torres entered the van, there were already two other people in handcuffs seated in the back seat.

74.     Mr. Torres remained in the police van for approximately two and a half hours as defendants John Doe #2 and John Doe #3 drove around the area and picked up two additional people who had been placed under arrest.

75.     Upon information and belief, all four of the other arrestees in the van had been arrested for marijuana possession.

76.     Mr. Torres was eventually taken to the 52nd precinct where he was held for a number of hours.

77.     While at the 52nd precinct, Mr. Torres was subjected to an invasive strip search by defendants John Doe #4, John Doe #5 and John Doe #6.  Mr. Torres was required to remove all of his clothes and submit to an exhaustive search, during which he was made to squat naked in front of the three officers.  The strip search left Mr. Torres feeling violated, humiliated, embarrassed and disgusted.

78.     Mr. Torres was able to produce accurate identification.

79.     Mr. Torres was also fingerprinted at the 52nd precinct.

80.     Later that night, Mr. Torres was taken to Bronx Central Booking where he was held overnight.

81.     Mr. Torres was wrongfully imprisoned by defendants for over a full day.

82.     Mr. Torres was released on September 27, 2011.

83.     After his release, Mr. Torres' confiscated property was never returned to him.  He was never issued a voucher for any of the items.

84.     Mr. Torres missed his job interview as a result of his arrest.

85.     Mr. Torres was charged with Criminal Possession of Marijuana, a misdemeanor, pursuant to N.Y. Penal Law § 221.10.

86.     This charge was knowingly and intentionally false and malicious.

87.     Defendant Goulart swore to a false and fabricated account of the events surrounding Mr. Torres' arrest.  In his deposition in support of the complaint against Mr. Torres, defendant Goulart falsely stated, under penalty of perjury, that Mr. Torres "was observed in public view with a clear ziplock bag [of] marijuana in [his] right hand which he placed in his sweatshirt sleeve."

88.     At no time during the events described above did the defendants have reasonable suspicion or probable cause to stop Mr. Torres or to search Mr. Torres.  At no time did Mr. Torres possess a ziplock bag of marijuana in his right hand in public view.

89.     The criminal charges against Mr. Torres were dismissed in his favor on February 20, 2014 after a partial pretrial hearing.

90.     Mr. Torres had to appear in court fourteen times over 877 days to defend the criminal charges against him.  Because Mr. Torres was charged with § 221.10, a B misdemeanor, the prosecution was afforded 60 days of statutory speedy trial time rather than the 30 days allowed for a violation under § 221.05.  Had Mr. Torres been charged with only the violation, statutory speedy trial time would have expired as of Mr. Torres' seventh court appearance on October 11, 2012.  Instead, because of the artificially extended period of time granted to the prosecution, Mr. Torres had to make an additional seven court appearances over 497 days.

91.     As a result of defendants' conduct described above, including restraining, falsely arresting, falsely imprisoning, illegally searching and maliciously prosecuting Mr. Torres, Mr. Torres suffered serious emotional injury, pain and suffering, emotional distress, mental anguish, humiliation and embarrassment.

92.     The arrest, detention and prosecution of Mr. Torres lacked probable cause, and were done maliciously, falsely, and in bad faith.  Defendants Goulart and John Does ##1-6 acted in wanton and reckless disregard for the rights of Mr. Torres.

93.     Mr. Torres has suffered substantial emotional harm as a result of his arrest. Mr. Torres was made to feel unwelcome in his own community and singled out for how he looked.  Since this arrest, he has been afraid and anxious to walk out on the street.  The

prolonged prosecution also took a serious emotional, mental and financial toll on Mr. Torres and his family. Mr. Torres and his family lived with a great deal of stress and anxiety during the pendency of the case.

94. Over the course of Mr. Torres' prosecution, Mr. Torres suffered anxiety about retaining employment after being arrested for a misdemeanor offense. He was forced to miss work on a number of occasions and suffered a number of adverse employment consequences.

95. Within ninety days after the criminal charges against him were dismissed in his favor, a written notice of claim, sworn by Mr. Torres, was served upon defendants at the Comptroller's Office at 1 Centre Street, New York, New York.

96. At least thirty days have elapsed since the service of the notice of claim, and adjustment or payment of the claim has been neglected or refused.

97. This action has been commenced within one year and ninety days after the criminal charges against Mr. Torres were dismissed in his favor.

***Christopher Medina***

98. Mr. Medina is a 37 year old Latino resident of the Bronx.

99. In August 2011, Mr. Medina worked at a recycling/redemption center in the Bronx.

100. At approximately 9:45 p.m. on August 16, 2011, Mr. Medina was walking westbound on East 182nd St. toward Webster Ave. He was on his way to meet a friend who lived at 2247 Webster Ave.

101.    After stopping at the intersection of East 182nd St. and Webster Ave., Mr. Medina crossed over to the west side of Webster Ave. and began to walk north on Webster Ave. toward his friend's building.

102.    When Mr. Medina arrived at 2247 Webster Ave., he rang the buzzer for his friend's apartment and waited for a response.

103.    As he waited, an unmarked police van driving southbound on Webster Ave. stopped at the intersection of 182nd St. and Webster Ave. and then reversed up the block, parking in front of 2247 Webster Ave.

104.    Mr. Medina was not engaged in any behavior that might have indicated or suggested that criminal activity was afoot.

105.    Defendant Levesque and several other officers—defendants John Does ##7-11—alighted from the van and approached Mr. Medina.

106.    The officers formed a semi-circle around Mr. Medina.

107.    Without prompting, Mr. Medina extended his arms out from his sides to show the officers that he was not holding any weapons.

108.    Defendant Levesque asked Mr. Medina if he lived in the building.

109.    Before waiting for an answer, defendant Levesque began to search Mr. Medina's person, placing his hands in Mr. Medina's pockets.

110.    Mr. Medina attempted to explain that he was waiting for his friend.

111.    As defendant Levesque searched Mr. Medina, Mr. Medina's cell phone rang.  Mr. Medina did not answer the phone.  Defendant John Doe #7 took Mr. Medina's cell phone from his hand.

112.    Defendant Levesque placed his hands in Mr. Medina's right pants pocket and recovered five small bags of marijuana.

113.    At no point prior to defendant Levesque's search of Mr. Medina had the marijuana been in public view.

114.    Defendant Levesque roughly placed Mr. Medina in handcuffs and shoved him into unmarked police van.

115.    Mr. Medina was taken to the 46th precinct, where he was detained for a number of hours.

116.    Mr. Medina was able to produce accurate identification.

117.    Mr. Medina was fingerprinted at the 46th precinct.

118.    In a deposition in support of the complaint against Mr. Medina, defendant Levesque falsely stated, under penalty of perjury, that Mr. Medina was observed "displaying to another with his right hand in public view 1 ziplock bag of marijuana," which he then "placed . . . in his right front pants pocket."

119.    These charges were knowingly and intentionally false and malicious.

120.    Based on the supporting deposition of defendant Levesque, Mr. Medina was arraigned on November 22, 2011 and charged with Criminal Possession of Marijuana, a misdemeanor, pursuant to N.Y. Penal Law § 221.10.

121.    The criminal charges against Mr. Medina were dismissed in his favor on May 12, 2014.

122.    Mr. Medina had seventeen court dates over 902 days.  Because Mr. Medina was charged with § 221.10, a B misdemeanor, the prosecution was afforded 60 days of statutory speedy trial time rather than the 30 days allowed for a violation under § 221.05.  Had

Mr. Medina been charged with only the violation, statutory speedy trial time would have expired as of Mr. Medina's tenth court date on June 10, 2013.  Instead, because of the artificially extended period of time granted to the prosecution, Mr. Medina had to make an additional seven court appearances over 336 days.

123.     As a result of defendants' conduct described above, including restraining, falsely arresting, falsely imprisoning, illegally searching and maliciously prosecuting Mr. Medina, Mr. Medina suffered serious emotional injury, pain and suffering, emotional distress, mental anguish, humiliation and embarrassment.

124.     The arrest, detention and prosecution of Mr. Medina lacked probable cause, and were done maliciously, falsely and in bad faith.  Defendants Levesque and John Does ##7-11 acted in wanton and reckless disregard for the rights of Mr. Medina.

125.     Since his arrest, Mr. Medina has lost trust and faith in the police.  He does not feel safe walking the streets at night and feels pursued wherever he goes.  Additionally, Mr. Medina's arrest was a source of tremendous shame, embarrassment and anxiety with his family and loved ones.

126.     Mr. Medina also suffered anxiety about retaining his job after being arrested for a misdemeanor offense and being forced to miss work on a number of occasions.

127.     Within ninety days after the criminal charges against him were dismissed in his favor, a written notice of claim, sworn by Mr. Medina, was served upon defendants at the Comptroller's Office at 1 Centre Street, New York, New York.

128.     At least thirty days have elapsed since the service of the notice of claim, and adjustment or payment of the claim has been neglected or refused.

129.     This action has been commenced within one year and ninety days after the criminal charges against Mr. Medina were dismissed in his favor.

### CLAIMS FOR RELIEF

First Claim for Relief
Violations of the Fourth Amendment under 42 U.S.C. § 1983
(Against All Individual Defendants)

130.     Plaintiffs reallege and incorporate by reference the foregoing paragraphs as if the same were fully set forth at length herein.

131.     By reason of the foregoing, by stopping Plaintiffs without sufficient legal cause, by unlawfully searching Plaintiffs, by confining Plaintiffs against their will, by imprisoning Plaintiffs, and by failing to take steps to intercede and protect the Plaintiffs from such treatment, the Individual Defendants deprived Plaintiffs of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, in violation their rights guaranteed by the Fourth of the United States Constitution and 42 U.S.C. § 1983.  The Individual Defendants' conduct manifested deliberate indifference to Plaintiffs' constitutional rights.

132.     The Individual Defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employments as NYPD officers.  Said acts by the Individual Defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers.  The Individual Defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiffs of their constitutional rights secured by the Fourth Amendment of the United States Constitution and 42 U.S.C. § 1983.

133.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiffs sustained the damages hereinbefore alleged.

<u>Second Claim for Relief</u>
Violations of Due Process under the Fourteenth Amendment and 42 U.S.C. § 1983
(Against All Individual Defendants)

134.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs as if the same were fully set forth at length herein.

135.    By reason of the foregoing, by falsifying an account surrounding the events upon which the criminal complaints against Plaintiffs were based, by making false statements under oath in the criminal court proceedings against Plaintiffs, by maliciously prosecuting Plaintiffs, by failing to take steps to intercede and protect the Plaintiffs from such treatment, and by falsifying the criminal complaints against Plaintiffs for collateral purposes, including but not limited to satisfying the NYPD's quotas, the Individual Defendants deprived Plaintiffs of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including but not limited to, rights guaranteed by the Fourteenth Amendments of the United States Constitution.  The Individual Defendants' conduct manifested deliberate indifference to Plaintiffs' constitutional rights.

136.    The Individual Defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employments as NYPD officers.  Said acts by the Individual Defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers.  The Individual Defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiffs of their constitutional rights secured by 42 U.S.C. § 1983, and by the Fourteenth Amendments to the United States Constitution.

137.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiffs sustained the damages hereinbefore alleged.

<u>Third Claim for Relief</u>
Violations of the Fourth and Fourteenth Amendments under 42 U.S.C. § 1983
(Against All Supervisory Defendants)

138.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs as if the same were fully set forth at length herein.

139.    The Supervisory Defendants were, at the relevant times, supervisory personnel within the NYPD, with oversight responsibility over the Individual Defendants.  They were responsible for the training, instruction, supervision and discipline of the Individual Defendants, who unlawfully stopped, illegally searched, falsely arrested, and maliciously prosecuted Plaintiffs in violation of their constitutional rights.  The Supervisory Defendants were also responsible for instructing the Individual Defendants to achieve the quotas mandated by the NYPD.

140.    Upon information and belief, the Supervisory Defendants were aware and well-informed of the Individual Defendants' unconstitutional conduct perpetrated against Plaintiffs.

141.    The Supervisory Defendants had actual or constructive knowledge that the Individual Defendants were engaging in conduct that posed a pervasive and unreasonable threat to the constitutional rights of Plaintiffs.

142.    The Supervisory Defendants failed to protect Plaintiffs despite their knowledge that the Individual Defendants violated their constitutional rights and posed a serious threat to the free exercise of their constitutionally protected rights.

143.    The response of the Supervisory Defendants to their knowledge of this threat was so inadequate as to show deliberate indifference or tacit approval of the conduct of the Individual Defendants.

144.     The failure of the Supervisory Defendants to supervise and discipline the Individual Defendants amounted to gross negligence, deliberate indifference, and/or intentional misconduct.

145.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiffs sustained the damages hereinbefore alleged.

Fourth Claim for Relief
Violations of the Fourth and Fourteenth Amendments under 42 U.S.C. § 1983
(Against Defendant City)

146.     Plaintiffs reallege and incorporate by reference the foregoing paragraphs as if the same were fully set forth at length herein.

147.     Defendant City, through the NYPD, and acting under the pretense and color of law, permitted, tolerated and was deliberately indifferent to a pattern and practice of police officers charging individuals with violations of § 221.10 without probable cause to do so. This widespread practice of Manufactured Misdemeanors by the NYPD constituted a municipal policy, practice, or custom and led to Plaintiffs' malicious prosecutions.

148.     Defendant City, through the NYPD, and acting under the pretense and color of law, has been deliberately indifferent to the policy, practice and/or custom whereby NYPD officers intentionally target people, such as Plaintiffs, by Manufacturing Misdemeanors against them, in order to achieve collateral purposes, including but not limited to reaching quotas set by the NYPD.

149.     By permitting, tolerating, and sanctioning a persistent and widespread policy, practice and custom pursuant to which Plaintiffs were subjected to false arrest, Manufactured Misdemeanors and malicious prosecution, defendant City has deprived Plaintiffs of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States secured by 42 U.S.C. § 1983, including but not limited to, the right to be free from unlawful and

unwarranted deprivations of liberty and due process under the law guaranteed by the Fourth and

Fourteenth Amendments to the United States Constitution.

150.    As a direct and proximate result of the policy, practice and custom

detailed above, Plaintiffs sustained the damages hereinbefore alleged.

<u>Fifth Claim for Relief</u>
Malicious Prosecution
(Against Individual Defendants and Defendant City)

151.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs

as if the same were fully set forth at length herein.

152.    The Individual Defendants, without probable cause, falsely charged

Plaintiffs with violating § 221.10.  In so doing, the Individual Defendants acted with a knowing,

willful, wanton, malicious, grossly reckless, unlawful, unreasonable, unconscionable, and

flagrant disregard of Plaintiffs' rights, privileges, welfare and well-being, and are guilty of

egregious and gross misconduct toward Plaintiffs.

153.     All criminal proceedings commenced against Plaintiffs were terminated

in Plaintiffs' favor.

154.    Defendant City, as employer of the Individual Defendants, is responsible

for the Individual Defendants' wrongdoing under the doctrine of *respondeat superior*.

155.    As a direct and proximate result of the misconduct and abuse of authority

detailed above, Plaintiffs sustained the damages hereinbefore alleged.

<u>Sixth Claim for Relief</u>
Violation of N.Y. Crim. Proc. Law § 160.10
(Against Individual Defendants and Defendant City)

156.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs

as if the same were fully set forth at length herein.

157.     Despite the fact that the Individual Defendants were easily able to ascertain Plaintiffs' identities at the time of arrest, the Individual Defendants took Plaintiffs' fingerprints in violation of N.Y. Crim. Proc. Law § 160.10.  *See Dinler v. City of N.Y.*, 04-CV-7921 (RJS)(JCF), 2012 WL 4513352, at *18-20 (S.D.N.Y. Sep. 30, 2012).  In so doing, the Individual Defendants acted with a knowing, willful, wanton, malicious, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Plaintiffs' rights, privileges, welfare and well-being, and are guilty of egregious and gross misconduct toward Plaintiffs.

158.     Defendant City, as employer of the Individual Defendants, is responsible for the Individual Defendants' wrongdoing under the doctrine of *respondeat superior*.

159.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiffs sustained the damages hereinbefore alleged.

<u>Seventh Claim for Relief</u>
Negligent Hiring/Training/Discipline/Retention of Employment Services
(Against Defendant City)

160.     Plaintiffs reallege and incorporate by reference the foregoing paragraphs as if the same were fully set forth at length herein.

161.     Defendant City, through the NYPD, owed a duty of care to Plaintiffs to prevent the conduct alleged, because under the same or similar circumstances, a reasonable, prudent, and careful person should have anticipated that injury to Plaintiffs or to those in a like situation would probably result from the foregoing conduct.

162.     Upon information and belief, all of the Individual Defendants were unfit and incompetent for their positions.

163.    Upon information and belief, defendant City knew or should have known through the exercise of reasonable diligence that the Individual Defendants were potentially dangerous.

164.    Upon information and belief, defendant City's negligence in screening, hiring, training, disciplining, and retaining these Individual Defendants proximately caused Plaintiffs' false arrests and malicious prosecutions.

165.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiffs sustained the damages hereinbefore alleged.

WHEREFORE, Plaintiffs respectfully request judgment against Defendants as follows:

(A)     an order awarding compensatory damages in an amount to be determined at trial;

(B)     an order awarding punitive damages against the Individual Defendants and Supervisory Defendants only in an amount to be determined at trial;

(C)     reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

(D)     directing such other and further relief as the Court may deem just and proper, together with attorneys' fees, interest, costs and disbursements of this action.

Dated: November 13, 2014            Respectfully Submitted,
       Bronx, New York


                              _____/s/_____
                              Scott D. Levy
                              Johanna B. Steinberg
                              The Bronx Defenders
                              360 East 161st Street
                              Bronx, NY 10451
                              (718) 838-7878 (t)
                              (718) 508-3547 (f)

                              Jane H. Fisher-Byrialsen
                              Alissa Boshnack
                              Fisher, Byrialsen & Kreizer, PLLC
                              291 Broadway, Suite 709
                              New York, NY 10007
                              (212) 962-0848 (t)
                              (212) 577-1178 (f)

                              *Attorneys for Plaintiffs*